The case of the morning is Crystal Williams v. St. Elizabeth's Hospital Whenever you all are ready and you've had a chance to clear out. I should have said that I was not speaking to all of us but hold on. when all of the evidence in the records outside of the consent form, and I'll get back to the cases that the trial court relied on, but essentially in all those cases there was no other evidence, no other claim of testimony, physician testimony that supported a holding out. And this all goes back to Gilbert where Justice Freeman accurately so recognized the modern realities of modern medicine, and that is because of widely advertised medical services it's reasonable for patients to walk into a hospital, receive care, treat with a doctor, receive care, and believe that the doctor is in fact an employee of the hospital. So I think it's important to start and talk about the facts that we outlined on pages 3 and 9 in our papers, but hit the critical facts that we demonstrated to the court that we believe with all great respect to the trial court were improperly ignored. First, it's important to recognize based on McCoy and York and the other cases that all we need to demonstrate is that the patient relied in part on the hospital. It doesn't have to be sole reliance. McCoy stands for that proposition. York stands for that proposition. First, the relevant time period is 2006 and 7, but we're happy to go back to 2000 when the treatment started. And we point out to this court if we look at the supplemental record filed by the hospital before the motion was heard, their motion was heard, she treated at the St. Elizabeth's Medical Park at 1512 Green Mound Road in O'Fallon. That is a location that they prominently and widely advertised on their website, and that's where she saw Dr. Tissier some 35 times between 2000 and 2007 and throughout this pregnancy. But here are the critical facts. Dr. Tissier told her that he delivered babies at St. Elizabeth's. It was a good hospital. It was a good birth center, a good place to deliver a baby. He never told her he was not an employee. There were no signs in his office. There was no signs at St. Elizabeth's that said doctors were not employees. But what did she do? She did what Justice Friedman recognized. She went out to the website. You won't find this evidence in the cases that the defense relied upon. She read about the hospital. She saw that they've been delivering babies for 125 years. It's the hospital of choice for maternity center care, a specialized staff that they have, board-certified neonatologist on staff. She believed it to be a place that she wanted to have her baby, and that's the testimony in the record. She also testified that based on everything she learned, she believed Dr. Tissier to be an employee, which is reasonable. Justice Friedman recognized that back in Gilbert. I think it's also important to recognize here that there's not just holding out by the hospital, but there was holding out by Dr. Tissier. St. Elizabeth's Hospital submitted some 350-some pages of medical records before argument, and in those records you will see that on his stationery it says, Dr. Tissier, St. Elizabeth's Medical Park, O'Fallon. On his prescriptions, St. Elizabeth's Medical Park, O'Fallon. On letters that he gave the patient to take to work so she can return, Dr. Tissier, St. Elizabeth's Medical Park, O'Fallon. And that O'Fallon Medical Park is something that St. Elizabeth's Hospital held out and advertised on their website. And I have to emphasize, and I'm going to get to the consent form here in a moment, that under Illinois law, it's not so reliant. It's just that the patient has to rely on the hospital in part. Before I talk, and also to a very important factor here, there's testimony in the record that you will not find in all the cases relied upon by the defense that are solely consent form cases where they don't look beyond the consent form. When she was in the hospital, she testified that all the staff that cared for her had lab coats on that said St. Elizabeth's with their iconic logo. And iconic logos and colors are important. If you look at the sign outside the St. Elizabeth's Medical Park, you see the iconic, well-recognized logo of St. Elizabeth's. You see their color scheme blue. That's what she saw every time she pulled into the parking lot at St. Elizabeth's Court. That is a question of fact for a jury to consider. But before I turn to the consent form, I want to talk about an issue that I think the trial court misunderstood, an issue that I think is very important. St. Elizabeth's argued that this doctrine only applies to hospital-based physicians. That's simply not the law. And I'd like to point the court to the Malinowski case, which you will find, and I argue this to the trial court, on the IPI, Illinois Supreme Court, jury instructions, comments on use. They point to the Malinowski case, which says, a pre-existing relationship with a physician will not defeat a parent agency claim. In the Malinowski, it's substantially the same as this case. It was Loyola where the alleged malpractice occurred. This patient visited for years with an OB, similar to our case, at a facility that had Loyola signage. It was a clinic outside Loyola. And in that case, the amputation was a parent who had diagnosed breast cancer. The court held that the fact that it was not within the four walls of the hospital, but at another Loyola-represented facility, that a claim for a parent agency could proceed. And this is important because if you go to the notes on use, which we argue to the trial court, and I'm reading from the IPI right here, this is 2017-2018, a pre-existing physician-patient relationship will not be proved in claim by a patient of reliance upon the hospital, citing Malinowski, and it goes on to say, applying Gilbert to an outpatient clinic situation. The court, the defense here has said there's a critical distinction because this only essentially applies to hospital-based physicians. That's simply not the law. The King Court, the Scardina Court, the Schroder Court, the Petrovic Court all recognize that. In Petrovic, we had a primary care physician. We had an over-laryngologist that were outside the four walls of the hospital. I'd now like to talk to the consent form. As we outlined in our brief, the consent form is only a factor to be considered. It is not dispositive. If you look at Cherokee, Mized, and all the cases relied upon by the hospital, they clearly state if there is other evidence outside of the consent form, even if the consent form is not controversial, there is a question of fact on the issue of a parent agency. So let's look at the consent form in this case. And it's not just a disclaimer form. It's consent for treatment, guarantee, and assignment. So other consent forms that have been passed on as sufficient have been three paragraphs, four paragraphs. They don't contain multi-part sections. Here, it's two pages, 16 paragraphs. I'll get back to the consent language. But there are five paragraphs on the release of information to other doctors within the hospital, outside providers. After those five paragraphs, there's a paragraph on insurance, on Medicare, on HIV, on AIDS, on students being in the hospital. And the only place on that form where a mother who, by the way, was in labor, having contractions, had to put her initials was on the second page when it had to do with payment. There was no initials when it had to do with consent for treatment. But this is why when we get to the consent for treatment provision, why it's ambiguous and confusing. In LAM, if you go to the health court opinion, they actually put in there black, bold letters. All physicians are not employees. It's short. It's brief. It's three paragraphs. Here, it's filled with legalese. It's eight-point type. But they say and identify radiologists, pathologists, hospitalists, emergency room physicians as doctors who are not employees. It is silent as to obstetricians and gynecologists. But more importantly, the laws always recognize that mistranscriptions in a document are to be interpreted against the drafter. This is critical. On the form that St. Elizabeth is relying upon, Dr. Tissier's name didn't appear anywhere. There was a Dr. Mathis listed as the attending physician. He had nothing to do with her here. They put the wrong doctor on the form. Further, our client testified that she didn't know what an attending physician was. That was her testimony. And some may say, well, you know, is that reasonable? I will submit to this court that lawyers who practice in this area, obviously people who work in health care, judges and courts like yourself who hear about medical records may know what an attending physician is. I've done this. If you go out and poll family, friends, and professionals, people don't know what an attending physician is. And they want to make the jump. Even though we didn't name Dr. Tissier as the attending physician, she should have figured it out. Is that reasonable for a young mom? Is that reasonable for somebody who's in labor? Is that reasonable for somebody who's having contractions? But more importantly, I would point out that the case law that has found in favor of the defense on this issue, the doctor's name has not only been identified, but the doctor's group has been identified in the form. None of that exists in this case. Was Dr. Matthews with the group? No. He was a covering physician of some kind. He had never met her, doesn't know who she is. So I think it's inappropriate in the eyes of the law, especially in case law that goes back to the late 1800s, to hold the plaintiff to understanding that when they prepare the document, mistranscriptions are interpreted against the creator and drafter of the document. Is it your argument, though, it wouldn't have mattered if they had named him? She wouldn't know what an attending physician was? No, she's still to testify she didn't, but the document didn't include his name, which makes it that much more confusing and ambiguous. I mean, if you start on page one and you get through all the different provisions, you get through the AIDS, the HIV, the Medicare, and the initial aid, it's almost like an SAT question of reading comprehension. Is somebody really going to recognize what's in that form? I put that it's ambiguous, confusing, and unreasonable. Finally, you know, they argued to the trial court that she had another baby at Memorial Hospital and that for some reason destroys parent agency. Well, it doesn't at all because Dr. Tissier didn't deliver that baby. He told her he does all his work at St. Elizabeth's. He scheduled this at St. Elizabeth's. And I'd just like to direct the court to page, I think it's 808, the record, page 63, counsel for the defendant doctor asked a question about the other deliveries she had at Memorial. And she said, well, my OB was Dr. Tissier. He didn't deliver at Memorial. She had testified he delivered at St. Elizabeth's. But just like Dr. Mathis, the Stan Paul doctor, he was out. So another doctor directed her to Memorial. Another doctor delivered her at Memorial, who she described as being of Asian descent. That only supports her belief that he was reasonably an employee of St. Elizabeth's Hospital. So in closing my opening remarks here, I would simply say that the Lamb case, the Cherokee case, the Bora case, the Wallace case, all these cases relied upon by the defendant were completely void of deposition testimony that the plaintiff gave. And in our papers, you saw the signage outside St. Elizabeth's Medical Park. It's a sign that says St. Elizabeth's Medical Park. It has their logo. It has their color scheme. If a lady is submitted to you as an officer of the court, she will testify that that sign was there each and every time she pulled in there for treatment. And Dr. Tissier's name appears immediately below that. It says OBGYN care. There's no LLC. There's no AIM. What are the reasonable inferences there? With all respect to the trial court, he accepted arguments of weight and, in our view, misapplied the law. We have a jury indicted to determine this. We have a disabled child. We have a case in which the law of the state of Illinois, we believe, with all respect to the trial court, demands to be reversed, and this court requires a trial on the issues that we put forth. And I'll reserve the rest of my comments for rebuttal. Thank you. Okay. I should have stated this before we started. I know you all were in the courtroom at the beginning of the first trial, but Justice Cates is obviously not here today. She had something that she could not avoid, and so she is participating on this panel, but through the recorded session. Thank you, Justice. Justices, counsel, may it please the court. My name is Jason Gorley, and I'm here this morning on behalf of St. Elizabeth's Hospital. This court should affirm the circuit court's order granting summary judgment in favor of St. Elizabeth's Hospital because plaintiff here cannot demonstrate that Dr. Tissier, her personal physician, with whom plaintiff treated for seven years, is an apparent agent of St. Elizabeth's Hospital. Specifically here, plaintiff's claim of apparent agency fails because she cannot satisfy the reliance element or the holding out elements of an apparent agency claim. Here, plaintiff has to establish both elements to survive a summary judgment motion. Plaintiff's failed to establish either of those elements. First, with respect to the reliance element, this case is controlled by the critical distinction that controls the reliance element in an apparent agency analysis. And I want to be clear from the outset that when I'm using this phrase, critical distinction, it's not a phrase I'm introducing to the court this morning. It's a phrase that's been repeatedly used by the Illinois Supreme Court. That's from the first case in which the Illinois Supreme Court recognized an apparent agency claim in a medical malpractice context in Gilbert v. Sycamore Municipal Hospital. It was repeated in Buell v. Rush, and then repeated again in last year's Supreme Court holding in Yarbrough v. Northwestern Memorial Hospital. And that critical distinction asks whether the patient relied on the hospital for the provision of care at issue or whether the patient relied on the services of a particular physician. In the latter case, where the plaintiff relies on the services of a particular physician, the plaintiff cannot establish the reliance element, and the plaintiff's claim of apparent agency fails. Now, let me ask you this. With regard to this case, and we're here on determining whether or not summary judgment was proper, how is there not enough evidence, testimony to establish a question of fact to withstand a summary judgment motion? I mean, we've got pictures of, as counsel pointed out, of the sign that's St. Elizabeth. St. Elizabeth was the landlord of that property, and everybody below it was part of that group. We have the doctor telling her to go to St. Elizabeth. There seems to be a number of questions, any one of which establishes a fact that survives summary judgment motion. How come the judge found there was not? So, Your Honor, most of those facts that you mentioned all pertain to plaintiff's arguments concerning the holding out element of apparent agency analysis. So, first of all, to answer your question, it wouldn't affect the reliance element of the analysis because the reliance element just asks with respect to the care that was provided, did the patient rely on her personal physician, or did she rely on the hospital to provide that care? A number of cases to illustrate that fact have addressed these contexts where a patient presents to an emergency department. The patient walks in, she doesn't know any physicians that work in that emergency department, and she's provided with an emergency physician, usually the first physician available, to render her care. So, in those types of cases, when the courts look at the reliance element, they ask, well, did the court, excuse me, did the patient rely on the hospital for that care or a particular physician? And the answer in those cases is that, well, the patient walked into the hospital, so she relied on the hospital to provide that care. But those cases stand in stark contrast to the case presented here. In this case, the plaintiff had a seven-year period of time in which she treated with Dr. Tissier as her personal physician. She knew Dr. Tissier. She treated with him for prenatal visits for two children prior to the delivery of the twin-tier. She treated with him for routine office visits, and any time that medical issues would come up. I believe the record indicates that at a minimum, she treated with him at his office on 35 occasions. That's his independent office. That's not on the campus of St. Elizabeth's Hospital. That's not hospital care. I'm talking about strictly office visits with Dr. Tissier. And also, I'd like to direct the court's attention to the record at page, this is the supplemental record at C6, and that's Dr. Tissier's patient intake form. And on that intake form, the question is asked, how were you referred to this office? And plaintiff answered, I was referred by a member of my family. I believe the individual's name was Marcella Miller. So that form indicates that when she initially established her physician-patient relationship with Dr. Tissier, she was referred by a family friend, and she was referred directly to Dr. Tissier's office. That relationship did not involve St. Elizabeth's Hospital in any way. Well, we don't know that. I mean, it could be that she, I think there was testimony that she did examine websites and thought that she wanted to deliver at St. Elizabeth's. So, Your Honor, all of that testimony, I know the testimony to which you're referring in her deposition, all of that testimony addresses things that happened, excuse me, were alleged to have happened in 2007 when it's time for plaintiff to deliver her twins. So this has nothing to do with plaintiff's initial establishment of her physician-patient relationship with Dr. Tissier seven years earlier in May of 2000. In May of 2000 is when she completes that patient intake form and starts treating directly with Dr. Tissier. It's not until over seven years later in June of 2007 that she delivers the twins here. So earlier, when Ms. Williams, the plaintiff here, is testifying about where she was going to deliver her child and the fact that she looked on the website and things like that, that all happened long after she established that physician-patient relationship with Dr. Tissier. So when we're looking at the reliance element here, which the Supreme Court has repeatedly instructed and requires that we ask, did the patient rely on the hospital for care or did she rely on her personal physician? The answer has to be that she relied on the care of her personal physician with whom she had had a seven-year physician-patient relationship. But I still logically don't quite follow what you're saying because we still don't know whether or not she all along thought that he was affiliated with the hospital. Well, first of all, Your Honor, there's no evidence in the record demonstrating that St. Elizabeth's Hospital had anything to do with why she first established that relationship. Right, but we don't know that that wasn't the reason why. Well, we do, Your Honor, because the only evidence we do have is that she was referred there by a family friend. But that doesn't exclude the fact that she also thought that she wanted to deliver at St. Elizabeth's Hospital and he may have been, she thought, an employee of that hospital. That's all I'm saying. I mean, it doesn't necessarily prove it, but it doesn't exclude that. Well, Your Honor, a few responses to that question. And first of all is that, as I stated earlier, I think that regardless of what transpired, Plaintiff still had established this physician-patient relationship. She treated with Dr. Tissier for seven years, so when we're answering that reliance question, she relied on her personal physician and not St. Elizabeth's Hospital. Now, when I get to the holding out component of my argument, which I intend to address in a few minutes here, I'll demonstrate to the Court that she signed 13 consent for treatment forms at St. Elizabeth's Hospital, all of which advised her unequivocally that physicians providing care at the hospital were not apparent agents. So I do think that in part to answer your question, because I do think it touches on the holding out elements, that consent forms are relevant. To address Plaintiff's contentions regarding the signage in front of the office complex at which Dr. Tissier maintained an office, first of all, what Plaintiff is referring to here is an undated photo that was provided to the Court after the hearing on the motion for summary judgment. So argument was presented to the Court. We had years and years within which to conduct discovery. The matters were briefed, and after oral argument was conducted, Plaintiff submitted an undated photo. We don't know when that photo was taken. These arguments took place at the end of 2017. The relevant time period when this physician-patient relationship was established was back in 2000, 17 years earlier. So when Plaintiff is talking about the signage outside of the office, that really does not address the reliance element, and it certainly doesn't address the holding out elements, because we don't know what that sign, if it was even there, looked like in 2000. Even if you look at the sign in the briefing that Plaintiff has submitted, Dr. Tissier's sign is separate. It says OBGYN care, Dr. Tissier, and there's a number of different providers in that office park. So I would contend to the Court that simple fact that Dr. Tissier maintains an address in an office park certainly doesn't establish a question of fact with respect to the holding out element, and it certainly doesn't establish a question of fact with respect to the reliance element. In addressing the reliance element, I do want to address a number of the cases relied on by Plaintiff, because Plaintiff, throughout the briefing of this matter and in the circuit court, has repeatedly ignored this critical distinction that the Supreme Court has drawn in the parent agency cases. First of all, Plaintiff has placed a substantial amount of reliance on the York v. Rush case. That case involved a patient presenting to a hospital for treatment with his surgeon, but it wasn't the surgeon's care that was placed at issue. It was the care rendered by an anesthesiologist, and evidence was presented that the hospital was involved in scheduling that particular anesthesiologist to perform care. So what the Supreme Court looked at in that case is it applied the critical distinction that I discussed earlier, and the court said that in analyzing that distinction, although there was a preexisting physician-patient relationship with the patient and the surgeon, that care wasn't at issue. It involved a supporting physician who the Plaintiff didn't know, and because the Plaintiff didn't know that physician, the Plaintiff there had established the reliance element. Plaintiff also relies on Macquarie v. Evangelical Hospitals. Plaintiff mentioned that case this morning. That case involved care that was rendered by a neurosurgeon who the Plaintiff had never met. The Plaintiff showed up at the hospital for a procedure and simply accepted a referral to the next neurosurgeon available. Well, that didn't happen here. Plaintiff presented to St. Elizabeth's Hospital to have her children delivered by her personal OB-GYN, with whom she had treated for seven years. Plaintiff also relies on... Does it not make any difference at all that the support staff and anesthesiologists and everyone else was St. Elizabeth? My understanding is that those were all St. Elizabeth's employees. So what about Dr. Tissier? Well, Your Honor, it would not make a distinction in this case because their care has not been placed at issue. The sole allegation in this case is that Dr. Tissier was negligent with respect to the delivery of these twins. So that's why this case is so different than York and a number of the other cases discussed by the Plaintiff. It's not a supporting physician whose conduct has been placed at issue. Plaintiff doesn't criticize anesthesiologists, members of the nursing staff, anyone else who might provide supporting care. Plaintiff just alleges that her personal physician was negligent in performing the delivery. And just to kind of drive that point home, my Plaintiff's conceded in a reply brief that physicians deliver babies, hospitals don't deliver babies. That just illustrates to this Court that we're solely focused on Dr. Tissier's care. So there's a common thread in all the cases cited by Plaintiff with respect to the reliance element, and that's that all these cases involve treatment rendered by physicians that the Plaintiff didn't know. The hospital was involved initially in scheduling the services from a supporting physician or was involved in assigning an emergency department physician to provide that care. That, of course, is not the case here. Plaintiff presented for a delivery with her personal OBGYN. So what the Plaintiff is really asking the Court to do here with respect to the reliance element is not only ignore the critical distinction that's mandated by the Illinois Supreme Court, but to eliminate that distinction in its entirety. If Plaintiff's argument is accepted here, then no longer would courts be required to ask that question of whether the Plaintiff's relying on care rendered by her personal physician or if she's relying on the hospital to provide that care. The only answer here, given the body of record in this case, is that the Plaintiff was relying on Dr. Tissier to perform the delivery. This case is substantially similar to a case cited in our brief, which is Lamb-Rosenfeld v. Burke Medical Group. And in that case, the Plaintiff had established a physician-patient relationship with her physician. She treated that physician at her independent office location. Later on, a surgery is going to be performed at the hospital. The Plaintiff presents to the hospital for that procedure and ultimately files suit alleging that that particular physician's care was negligent. And the court correctly applied the critical distinction and said, here we have a case where the Plaintiff presented to be treated with her personal physician. So here, the Plaintiff did not rely on the hospital to provide the care. Now, interestingly, in that case, the court rejected the same argument that the Plaintiff presents here. We've heard a lot from the Plaintiff this morning about how a preexisting physician-patient relationship doesn't necessarily preclude a claim of a parent agency. But the court correctly recognized there that the only care at issue was the care rendered by the Plaintiff's personal physician. Unlike York, the court recognized in Lamb-Rosenfeld, they didn't have an issue regarding care rendered by a supporting physician. The only care at issue was that rendered by the Plaintiff's personal physician. So, Your Honors, I would submit that this case is substantially similar to Lamb-Rosenfeld and is controlled by the critical distinction repeatedly recognized by the Supreme Court. Now, before moving from the reliance element to the holding out factor, I do want to briefly address one of the facts in the record that was alluded to by counsel for Plaintiff. And that concerns Plaintiff's prior delivery at Memorial Hospital. And the reason we bring that up is because during this course of seven years where Plaintiff is being treated by Dr. Tissier, she receives prenatal visits with Dr. Tissier for one of her children. When it's time to deliver, Dr. Tissier is not available. And so she's directed to go to Memorial Hospital, not St. Elizabeth's Hospital. And that's important here because it really flies in the face of Plaintiff's argument that she relied on St. Elizabeth's Hospital with respect to care rendered by Dr. Tissier. I would submit to the Court that it's simply implausible to maintain that she relied on St. Elizabeth's Hospital to provide her physicians if the moment that her personal physician is unavailable, she gets sent not to St. Elizabeth's Hospital but to a completely not only unaffiliated hospital but a competing hospital in Belleville. So, Your Honor, that argument is simply implausible. And the reason we bring it up is because it demonstrates that not only here is Plaintiff unable to present sufficient facts to establish the reliance element, but the facts actually fly in the face of that argument and demonstrate that Plaintiff certainly did not rely on St. Elizabeth's Hospital for the care rendered by Dr. Tissier. I still don't understand how that proves with any definitiveness that she didn't consider delivering twins, which are definitely different than a single birth at St. Elizabeth's. We don't know that. Based on the fact that she delivered a prior single child at a competitor hospital. Your Honor, I think that critical distinction I discussed earlier does clearly answer the reliance question. The reason I bring up the memorial component of the body of record here is because when Plaintiff is saying that she relied on St. Elizabeth's Hospital to provide all of this care, it's just not plausible to say that, well, once Plaintiff's personal physician is not available, don't go here and be treated by another physician, but instead go to a competing hospital in the area. That just doesn't make sense. It's simply implausible in the apparent agency analysis. So I'm not saying that that fact on its own requires this outcome, but I'm certainly saying that it supports the outcome that's mandated by the critical distinction imposed by the Supreme Court. Now, not only was summary judgment required to be entered based on the reliance factor in the apparent agency analysis, but it was also required to be entered on the holding out element. And that's because here Plaintiff signed not one, not two, but 13 consent for treatment forms clearly demonstrating that Dr. Tissier, and any physician at the hospital, was an independent contractor and not an agent or employee. And I recognize that we don't have a substantial amount of time left, so I do want to mention to this Court that the language here that we're dealing with is unequivocal. All the cases relied on by Plaintiff in the holding out argument and the consent form argument concern unequivocal language. So the language in the consent form says physicians here may or may not be agents of the hospital or some or all physicians are employees of the hospital. The language here is unequivocal. It simply and clearly states, I further understand that the physicians on the staff of this hospital, including the attending physicians, are not employees or agents of the hospital, but rather are independent contractors who may have been granted the privilege of using its facilities for the care and treatment of the patients. Here that language is unequivocal. It's not like the cases cited by Plaintiff, which state some or all physicians may be employees of the hospital, some may not be. This language is unequivocal. Plaintiff also mentioned the fact that on one of the consent forms it lists Dr. Mathis at the bottom. Well, first of all, that language does not conflict with that unequivocal language I just mentioned to you. And I'd encourage the Court to take a look at that at page C583 of the record. It's listed at the bottom. It's a stamp included on it just to make sure that this is part of the patient's record. But moreover, I'd encourage the Court to take a look at three other consent forms that Plaintiff signed in the weeks preceding her delivery. At C585, there's a consent form bearing the same language I stated here that has Dr. Tissier's name printed at the bottom, right where Dr. Mathis was printed. This form was signed on May 23rd of 2007. Two weeks prior to the delivery issue. Permission to conclude my argument, Your Honor? Yeah, real briefly. And I had a question I want to let you go over a little bit because there's a question that Justice Cates asked us to ask of you guys. And so I'll be a minute to answer that one as well. But go ahead and finish. Your Honor, I wanted to conclude by responding to the Plaintiff's allocation concerning Dr. Mathis's consent form. And I wanted to mention to the Court that there are a number of consent forms where Dr. Tissier's name is stamped in the same section at the bottom of that consent form. And I mentioned the first one, which is at C585 of the record. That was about a week and a half prior to the delivery issue. There's also a form at C587, also has Dr. Tissier's name stamped at the bottom. That's in April of 2007. And again, C589, we have another form where Dr. Tissier's name is stamped at the bottom. So even if this Court were to accept Plaintiff's argument concerning Dr. Mathis's name being stamped at the bottom, which I don't think is appropriate, the Court's concerns in that regard can be alleviated by the fact that there are a litany of consent forms in this case with Dr. Tissier's name stamped at the bottom. And, in fact, in her deposition, Plaintiff acknowledged that these forms would relate to Dr. Tissier because Dr. Tissier's name is stamped at the bottom of the forms. So the question that Justice Gates asked was, is the statute of limitations an issue that has been raised by St. Elizabeth's Hospital? Your Honor, we proceeded on a motion for summary judgment in this case, and that issue was solely focused on the apparent agency claim brought by Plaintiff. So in that summary judgment, we focused on the fact that there's no genuine issue of material fact on the reliance element, which is controlled by that critical distinction that I discussed with the Court this morning, and there's no genuine issue of fact with respect to the holding out factors because Plaintiff signed 13 consent for treatment forms, clearly and unequivocally advising her that physicians providing care at the hospital are not employees but are independent contractors of the hospital. And the case is clear that when the forms are unequivocal, those forms control on the holding out element. All right. Thank you very much, Judge. Thank you. Counselor? Thank you. I did my best to save a little extra time, but I'm going to move quickly here in the lightning round just to hit some points. Counsel mentioned the York case, but I'd like to say about York, and then I will tell the Court I did the discovery of York, tried York, it was on the papers of the Supreme Court. What I think is relevant about that case is Dr. York was an orthopedic surgeon. He spent his whole life in hospitals. And the defense argued, gosh, here's an orthopedic surgeon who spent his whole life from hospitals and anesthesiologists, if anybody should know about independent contractor relationships, it's him. But no, that was a question of fact that went to a jury. A jury was allowed to evaluate that. And for the same reasons, Crystal Williams should have the same benefit, as should her disabled child, to have a jury determine what she really understood these relationships were. I talked about the instruction, the Supreme Court instructions, that states the element of justifiable reliance is satisfied where there is reliance on the hospital-applied care rather than a specific physician. A preexisting physician-patient relationship will not preclude a claim by a patient on reliance. And they cite that for lawyers and judges to follow down the state of Illinois, and McCrory, Cain, Petrovic do as well. And I want to talk about Malinowski, because in Malinowski, they came out and said, we reject Loyola's narrow reading of Gilbert. We decline to read such a holding in Gilbert decision, as we do not believe Gilbert was intended to subscribe all parent agency claims in the medical area. Again, they're way off campus, way away from Loyola. There's a building with the sign no different than we have in this case. And again, McCrory, I did mention McCrory. I think the trial court interpreted the argument St. Elizabeth made, very able lawyers who I respect greatly, but they made it sound like they took the next neurosurgeon that was available and went into surgery. The patient, if you read the opinion, treated conservatively, saw the doctor for physical therapy, injections, eventually ended up in surgery. So McCrory, Hammer, Schroeder, Petrovic, Malinowski all deal with non-hospital-based doctors. Malinowski was an OB, and a parent agency was allowed to proceed. In fact, in Spiegelman, the court stated, the fact that the plaintiff contractor, the private MD as a primary surgeon, was not inconsistent with the hospital having closed the independent doctor with the parent agency. Crystal Williams, she really was impressed with St. Elizabeth. She wanted to have her baby there. She went to the website. She relied on it. She relied on it in part, and that's all a law requires. We didn't get to present this to a jury. We believe that the court with all due great respect made determinations of weight. And I think what counsel argued today was the weight of the evidence. I think the questions that have been asked of all of us today give rise to questions of fact and why a jury should hear the evidence in this case. Really quickly, on the Lamb case, which they pretty much hung their whole motion on and what the judge relied upon in his order, in that case there was an incomplete record. It was grossly incomplete. There were improper arguments. The counsel cited a supplemental record that did not exist. The court came out and said, all insufficiencies must be decided against the plaintiff in that case for not completing the record. But more importantly, in Lamb and Gore and all these other cases, we didn't have the testimony that we have here with Crystal Williams. That's it, the consent form. That's all we have, and that's all the court had to consider. That's not our case. The other case they relied upon, and I'll move quickly here as I finish up, is the Mizad case where it was an Arabic-speaking patient. His wife or daughter interpreted the form, and it was thrown out on the consent form, which is a very short, understandable form. But it's important to listen to what that court said. The consent form by itself would not necessarily warrant so many judgments in Palos' favor if there was other evidence that Palos was holding out Dr. Kosheros, its agent or employee. There certainly could be other situations in which the patient signed a form, but there are other factors that give rise to holding out. And that's what we have in this case, and that's what the law recognized. Really quickly on the sign, they didn't get up here and tell you it wasn't there because they know it was there. I will tell you as an officer of the court, our client will testify it was there. We are at the summary judgment level. We're not required to prove our case. I would also tell the court that in terms of that sign, it's been there for a long time. I even believe the court could take judicial notice if it's present. It's been in the community. But here's the corroboration. It's on their website, okay? And that was authenticated in the plaintiff's deposition. And St. Elizabeth's Medical Park is on the stationary of the alleged apparent agent going back to 2000. So I think that's a question to wait for a jury to determine in a trial. And we're asking for the ability to pull it up. I will point out that the main case they rely upon in holding out is the Steele case. And I believe, with all respect to counsel, that that case was miscited because in Steele, they found that there was a holding out, and the court held the consent form. And the Steele court said, We find the consent form does not convincingly proclaim, if I notice, that Dr. Moran was an independent contractor and thereby adequately defeat the holding out factor. But it found that they didn't have the facts that we have, that there was testimony by the plaintiff on other issues. And only because they cited the Supreme Court case of Yarborough, if you would just permit me less than a minute to comment on that, I think it would be appropriate. We cited Yarborough in our motion because at the time it was good law in the first district. We thought it was helpful to our case. The Supreme Court came out and reversed Yarborough. And the trial court put a lot of emphasis on that. But here's why Yarborough doesn't really apply in this case. It really doesn't help the hospital. Unlike Malinowski, in Yarborough, it was a clinic, not owned, not operated, by Northwestern, way off-site, it was the Erie Clinic, they had no control, not a named defendant. And so in Yarborough, there was no Northwestern signage. It was a federally funded clinic, so the LA Supreme Court, I think wisely so, said, That's a federal tort claims act case. And finally, and I listened to the arguments and watched the arguments on the Supreme Court website, fantastic public policy arguments by Northwestern. They said, Look, the negligence at Erie Clinic, we don't own that. You know, it's not our building. Negligence did not take place in Northwestern. But like Malinowski, the negligence that we alleged took place in St. Elizabeth's. So for those reasons, Yarborough helped us at the time, doesn't help us now, but doesn't, in a very well-reasoned decision, the public policy arguments accepted by the LA Supreme Court are well-reasoned. There was no negligence that took place at the Erie Clinic. It's not federally funded here. The negligence took place at St. Elizabeth's. With great respect to the trial judge and with respect to this court, we're asking this disabled minor who's permanently injured to allow a jury to consider this question. Thank you. Thank you. We will take into consideration the arguments heard today and render a judgment as soon as possible. Thank you. Thank you.